

Copy hand-delivered
to chambers

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT
FILED

2014 JUN -9  A 11: 51

JON W. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                   Case No. 13-CR-084

NAJEE MOORE,

        Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Karine Moreno-Taxman, Assistant United States Attorney, and Daniel H. Weiss, Trial Attorney, United States Department of Justice, Civil Rights Division, and the defendant, Najee Moore, individually and by attorney Thomas Wilmouth, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in ten counts of an 11-count superseding indictment and in a six-count information, which alleges violations of Title 18, United States Code, Sections 371, 1591 and 1952.

3.      The defendant has read and fully understands the charges contained in the information. He fully understands the nature and elements of the crimes with which he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.     From on or about July 2007, and continuing through on or about March 2009, in the State and Eastern District of Wisconsin and elsewhere,

**NAJEE C. MOORE**
**a/k/a "Finesse," "Ness,"**

did knowingly and intentionally conspire with DAVID MOORE, a/k/a "King David, "KD," in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain,  and maintain JV-1, having had a reasonable opportunity to observe JV-1, a minor female, and knowing, and in reckless disregard of the fact, that JV-1 had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion and any combination of such means, would be used to cause JV-1 to engage in a commercial sex act.

2.     As part of this offense, Defendant NAJEE C. MOORE committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere,

a)   NAJEE C. MOORE controlled JV-1, by requiring her to stay with him for approximately one (1) week around Christmas, 2007.

2

b) On or about February 2008, NAJEE C. MOORE took JV-1 to live with him and DAVID MOORE, knowing that DAVID MOORE and NAJEE C. MOORE planned to cause JV-1 to engage in commercial sex acts for their financial benefit.

c) DAVID MOORE and NAJEE C. MOORE agreed that JV-1 would engage in erotic dancing and prostitution and provide them with the proceeds from these activities.

d) DAVID MOORE conspired with NAJEE C. MOORE to instruct JV-1 as to how to identify and solicit prostitution customers at strip clubs and other locations.

e) DAVID MOORE and NAJEE C. MOORE used force, threats of force, fraud, coercion and a combination of such means to cause JV-1 to engage in commercial sex acts.

f) DAVID MOORE and NAJEE C. MOORE took JV-1 to strip clubs and other locations to obtain prostitution customers and would collect the money from the erotic dances and commercial sex acts they caused JV-1 to engage in.

g) NAJEE C. MOORE had a reasonable opportunity to observe JV-1 and was aware that JV-1 had not attained the age of 18 years.

All in violation of Title 18, United States Code, Sections 371, 1591(a)(1), and 1591(b)(1).

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.     During the spring of 2012, in the State and Eastern District of Wisconsin and elsewhere,

NAJEE C. MOORE
a/k/a "Finesse", "Ness"

used a facility in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of prostitution offenses in violation of the laws of the State of Wisconsin.

2.     As part of this offense, NAJEE C. MOORE committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere,

   a)  NAJEE C. MOORE had AV-4 post photographs of herself on backpage.com, a facility in interstate commerce, with intent that AV-4, herself, engage in commercial sex acts.

   b)  NAJEE C. MOORE paid for the backpage.com advertisements.

   c)  NAJEE C. MOORE transported AV-4 to the commercial sex encounters arranged as a result of the backpage.com advertisements.

   d)  NAJEE C. MOORE received the proceeds from the commercial sex acts performed by AV-4.

All in violation of Title18, United States Code, Section 1952(a)(3).

## COUNT THREE

1.     During August 2012, in the State and Eastern District of Wisconsin and elsewhere,

**NAJEE C. MOORE**
**a/k/a "Finesse," "Ness,"**

did knowingly and intentionally conspire with another, in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain, and maintain JV-3, having had a reasonable opportunity to observe JV-3, a minor female, and knowing, and in reckless disregard of the fact, that JV-3 had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that means of force, threats of force,

4

fraud, coercion and any combination of such means would be used to cause JV-3 to engage in a commercial sex act.

2.    As part of this offense, Defendant NAJEE C. MOORE committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere:

a)  During August, 2012, NAJEE C. MOORE observed JV-3 exiting a car after arguing with the driver and getting out of the car.

b)  NAJEE C. MOORE, under the ruse of providing JV-3 shelter, took JV-3 to a hotel room, for which he paid.

c)  During August 2012, NAJEE C. MOORE required JV-3 to engage in commercial sex acts when she was a minor.

d)  NAJEE C. MOORE conspired with another to photograph JV-3 and posted her photos on backpage.com, a facility in interstate commerce, advertising JV-3 for prostitution.

e)  NAJEE C. MOORE conspired with another to instruct JV-3 about conducting prostitution, and instructed JV-3 to ask potential prostitution customers if they were law enforcement and also to touch their genitals.

f)   JV-3 was instructed to give the money she received from prostitution customers to NAJEE C. MOORE.

g)  NAJEE C. MOORE took the money JV-3 earned from engaging in commercial sex acts.

h)  NAJEE C. MOORE used fraud to cause JV-3 to engage in commercial sex acts.

i)  NAJEE C. MOORE had reasonable opportunity to observe JV-3 and did observe JV-3

5

All in violation of Title 18, United States Code, Sections 371, 1591(a)(1), and 1591(b)(1).

## COUNT FOUR

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.     From on or about September 2011 and continuing through in or about November 2011, in the State and Eastern District of Wisconsin and elsewhere,

**NAJEE C. MOORE**
**a/k/a/ "Finesse," "Ness,"**

did knowingly and intentionally conspire with another, in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain, and maintain AV-1, an adult female, knowing, and in reckless disregard of the fact, that means of force, threats of force, fraud, coercion and any combination of such means would be used to cause AV-1 to engage in a commercial sex act.

2.     As part of this offense, Defendant NAJEE C. MOORE and a co-conspirator committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere:

a)  Persuaded AV-1 to work for NAJEE C. MOORE as a prostitute.

b)   Instructed AV-1 as to how to conduct prostitution, directed her to obtain payment before engaging in any sex acts and, afterwards, to provide the money to NAJEE C. MOORE.

c)   Obtained photographs of AV-1 and advertised AV-1 for prostitution on backpage.com, a facility in interstate commerce.

d)  Used a mobile phone, a facility in interstate commerce, to respond to phone calls from prostitution customers and arranged the times and locations for AV-1's prostitution encounters.

e)  Transported AV-1 to Fond du Lac, Wisconsin to engage in commercial sex acts which caused AV-1 to be arrested in an undercover police enforcement action.

6

f) Used force, threats of force, fraud, coercion and a combination of such means to convince AV-1 to continue to work for them despite AV-1's desire to get away from NAJEE C. MOORE.

g) NAJEE C. MOORE paid for AV-1's bail and told her to continue to engage in commercial sex acts to make back the money.

All in violation of Title 18, United States Code, Sections 371, 1591(a)(1), and 1591(b)(1).

<u>COUNT FIVE</u>

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.    From on or about July 2012 and continuing through August 2012,

**NAJEE C. MOORE**
**a/k/a/ "Finesse," "Ness,"**

did knowingly and intentionally conspire with another, in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain, and maintain AV-2, an adult female, knowing, and in reckless disregard of the fact, that means of force, threats of force, fraud, coercion and any combination of such means would be used to cause AV-2 to engage in a commercial sex act.

2.    As part of this offense, Defendant NAJEE C. MOORE and a co-conspirator committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere:

a)   Conspired with AV-2 to prostitute and convinced AV-2 to provide the proceeds from prostitution to NAJEE C. MOORE.

b)   Transported AV-2 to Chicago, Illinois, where AV-2 engaged in acts of prostitution.

c)   Advertised AV-2 on backpage.com, a facility in interstate commerce, for prostitution in Milwaukee and Chicago.

d)   NAJEE C. MOORE took the money from AV-2 that she earned from engaging in commercial sex acts.

7

All in violation of Title 18, United States Code, Sections 371, 1591(a)(1), and 1591(b)(1).

## COUNT SIX

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.      From on or about January 2, 2013 through on or about January 4, 2013, in the State and Eastern District of Wisconsin and elsewhere,

**NAJEE C. MOORE**
**a/k/a/ "Finesse," "Ness,"**

did knowingly and intentionally conspire with another, in and affecting interstate commerce, to recruit, entice, harbor, transport, provide, obtain, and maintain AV-3, an adult female, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion and a combination of such means would be used to cause AV-3 to engage in a commercial sex act.

2.      As part of this offense, Defendant NAJEE C. MOORE and a co-conspirator committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere:

a)  Scouted out AV-3 as a person who could prostitute for NAJEE C. MOORE in Milwaukee.

b)  On January 2, 2013, NAJEE C. MOORE traveled from Milwaukee, Wisconsin to Rockford, Illinois to pick up AV-3 and the co-conspirator from Rockford, Illinois, traveling in interstate commerce.

c)  From on or about January 2, 2013 through on or about January 4, 2013, harbored and maintained AV-3 in Milwaukee, knowing that means of force, threats of force, fraud, coercion and a combination of such means would be used to cause AV-3 to engage in a commercial sex act.

All in violation of Title 18, United States Code, Sections 371, 1591(a)(1), and 1591(b)(1).

8

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

7.     The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum term of imprisonment and fine:

> Counts One through Six each carry a maximum sentence of five years and a $250,000.00 fine, as well as a mandatory special assessment of $100, and a maximum of three years of supervised release for a combined maximum sentence of up to thirty (30) years imprisonment, a $1.5 million fine, three years of supervised release and a $600 special assessment. The parties further recognize that a restitution order may be entered by the court.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF INDICTMENT

9.     The government agrees to move to dismiss the indictment and superseding indictments at the time of sentencing.

## ELEMENTS

10. The parties understand and agree that in order to sustain the charge of Conspiracy, as charged in Counts One and Three through Six the government must prove each of the following propositions beyond a reasonable doubt:

 First, that the conspiracy as charged existed;

 Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy; and

 Third, that an overt act was committed by at least one conspirator in furtherance of the conspiracy.

11. The parties understand and agree that in order to sustain the charge of Interstate and Foreign Travel in Aid of Racketeering Enterprises as set forth in Count Two the government must prove each of the following beyond a reasonable doubt:

 First, the defendant traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of any unlawful activity and

 Second, the unlawful activity included prostitution offenses in violation of the laws of the State of Wisconsin.

10

## SENTENCING PROVISIONS

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

16.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands

11

that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty. The defendant acknowledges that the counts contained in the second superseding indictment and any counts dismissed from the information will also be considered by the court as part of his relevant conduct.

## Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Counts One and Three through Six, is 34 under Sentencing Guidelines Manual §§ 2X 1.1(a), 2G1.1(a)(1), and 2G1.3(a)(1).

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 34 under Sentencing Guidelines Manual §§2E1.2(a)(2) and 2G1.1(a)(1).

## Specific Offense Characteristics

20.     The parties agree to recommend to the sentencing court that the specific offense characteristic applicable to Counts One and Three is a two-level increase because the offenses involved a commercial sex act pursuant to § 2G1.3(b)(4).

21.     The parties agree to recommend to the sentencing court that an additional specific offense characteristic applicable to Count Three is a two-level increase because the offense involved the use of a computer pursuant to § 2G1.3(b)(3).

13

## Aggravating Role

22.     Pursuant to Sentencing Guideline Manual 3B1.1(c), the parties agree to recommend to the sentencing court that a two-level increase be given because the defendant was an organizer of the activity.

## Obstruction

23.     Pursuant to Sentencing Guidelines Manual § 3C1.1, the government agrees to recommend to the sentencing court that a two-level increase be given for obstruction of justice.

## Determination of Combined sentence

24.     The government  agrees to recommend to the sentencing court that the combined offense level for the six counts is 47 and the defendant recommends the offense level is 45, as the offenses involve more than 5 units pursuant to § 3D1.4(a).

## Acceptance of Responsibility

25.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offenses prior to sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual

14

§ 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

26.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

27.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

28.     The government agrees to recommend a sentence of thirty years imprisonment unless the government moves for a downward departure as delineated in paragraph 35.

## Court's Determinations at Sentencing

29.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

15

30.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

31.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

32.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Special Assessment

33.     The defendant agrees to pay the special assessment prior to or at the time of sentencing.

34.     Pursuant to 18 U.S.C. § 3583(d), the defendant has been advised and understands the court shall order as a mandatory condition of supervised release, that the defendant comply with state sex offender registration requirements. The defendant also has been advised and understands that under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions: the location of his residence; the location of his employment; and, if he is a student, the location of his school. Registration will require that the defendant provide information that includes name, residence address, and the names and addresses of any places at which he will be an employee or a student. The defendant understands that he must update his registration not later than three

16

business days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations may subject him to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine and/or imprisonment.

## DEFENDANT"S COOPERATION

35.     The government acknowledges, understands, and agrees that the defendant has provided some substantial assistance to the government in the investigation and prosecution of others. The defendant, by entering into this agreement, agrees to fully and completely cooperate with the government in its investigation of this and related matters identified in the attorney proffer dated July 15, 2013 and attached under seal to this agreement and to testify truthfully, and completely before the grand jury and at any subsequent trial or proceeding if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant continues to provide substantial assistance to the government in this investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from (a) the applicable sentencing guidelines and (b) dismissal of two counts of the information. The government would then recommend a sentence of 20 years, the statutory maximum possible penalty faced on conviction of four counts of the Information. The defendant is free to recommend a sentence of not less than 10 years. The defendant acknowledges that the government will not join in that recommendation. The defendant acknowledges and understands that the Court will make its own determination regarding the appropriateness and extent to which cooperation should affect the sentence.

17

# DEFENDANT'S WAIVER OF RIGHTS

36.    Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case, and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, (3) ineffective assistance of counsel and (4) a sentence predicated on a failure of the court to consider the defendant's principal, non-frivolous arguments in mitigation when selecting an appropriate sentence for the defendant.  The defendant agrees that such appeal is limited to the sentence(s) and that the defendant cannot appeal the conviction(s).

37.    In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.      If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.      If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he or she was persuaded of defendant's guilt beyond a reasonable doubt.

d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

38.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offenses to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

39.    The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

40.    The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

19

41.     The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations, venue, etc.

## Further Civil or Administrative Action

42.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

43.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

44.     The parties acknowledge, understand, and agree that if the court orders that this agreement be sealed, this agreement will remain under seal and not become part of the public record in this case as specified in the court's sealing order.

45.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

46.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed.

20

The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

47.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 6/8/14

NAJEE MOORE
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 6/9/14

THOMAS WILMOUTH
Attorney for Defendant

For the United States of America:

Date: 6/9/14

JAMES L. SANTELLE
United States Attorney

Date: 6/9/14

KARINE MORENO-TAXMAN
Assistant United States Attorney

Date: 6/9/14

DANIEL H. WEISS
Trial Attorney, Civil Rights Division

22

**Factual Basis**
**Attachment A**

The defendant admits to sex trafficking each of the victims in this case knowing or in reckless disregard of the fact that means of force, threats of force, fraud or coercion, or any combination of such means would be used to cause the victim to engage in commercial sex acts.

## Count One

As part of this offense, Defendant Najee Moore committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere,

Najee Moore met JV-1 in April 2007, when she was living in foster care in Milwaukee, Wisconsin. JV-1 was 15 years old at that time and Najee Moore was 16. The two began dating and spending time together. In December 2007, Najee Moore convinced JV-1 to have three-way sex with another girl to celebrate his birthday. After the other girl left, Najee Moore convinced JV-1 to remain in his bedroom and to hide under his bed. Najee Moore convinced JV-1 to hide under his bed and emerge to make breakfast and have sex. Najee Moore would sneak food to the room from the kitchen for JV-1. When Najee Moore was out of the house, JV-1 was required to remain under the bed and one time she urinated on herself, Najee Moore required her to clean up the urine when he got home. This situation lasted from December 17, 2007 until Christmas Day 2007, when JV-1 used her cell phone and reported where she was located and, eventually, Najee Moore's mother, Bridgette Campbell, came to the house, found JV-1 under the bed, and told both JV-1 and Najee Moore they had to leave her residence.

Thereafter, Najee Moore and JV-1 moved in with Najee Moore's father, David Moore. JV-1 learned that Najee Moore's father was a pimp known as "King David." JV-1 learned that David Moore would regularly beat his girls for not making enough money, had beat Najee Moore's mother, and may have been involved in the murder of a man who had fathered a child with Najee Moore's mother. Najee Moore and David Moore agreed that they would require JV-1 to work as an exotic dancer and prostitute for their financial benefit. David Moore insisted that JV-1 refer to Najee Moore as "Daddy."

Because JV-1 was under 18, she could not legally work as a dancer. David Moore took JV-1 to another Milwaukee pimp known as "Sacramento Slim," who photographed JV-1 and used his computer to create a false identification card stating that she was older. David Moore and Najee Moore took JV-1 to "Rickey's" or "On the Border," Milwaukee strip clubs where

David Moore convinced the manager to allow JV-1 to dance. David Moore instructed JV-1 how to approach prospective prostitution customers, how to dance and what to charge for prostitution.

JV-1 danced at "On the Border" for a little over a week, earning on the average $75 to $150 per night. JV-1 gave most of the money to Najee MOORE, but also gave some money to David Moore. When Najee Moore would become angry, he would punch her in the stomach with a closed fist, slap her in the face with an open hand and choke her by wrapping his arm around her neck from behind.

In addition to "On the Border," David Moore took JV-1 to another Milwaukee strip club called "Solid Gold." David Moore stayed in the club while JV-1 worked, but acted as if he did not know her. JV-1 did not make much money at "Solid Gold" and was unable to procure prostitution dates. After work, David Moore counseled JV-1 on the men he believed she should have been approaching. While dancing at "Solid Gold," JV-1 met an individual, who became a prostitution customer. JV-1 engaged in prostitution dates with this customer while she was 16 years old and with regard to customers, Najee Moore and David Moore discussed the prices per hour of sex. JV-1 gave Najee Moore and David Moore money she earned prostituting.

JV-1 continued to work for both David Moore and Najee Moore as a prostitute. David Moore insisted that JV-1 use condoms when having sex with prostitution customers and supplied her with condoms. Najee Moore regularly had sex with JV-1. JV-1 started to spend more time with David Moore, who drove her to bars to look for prostitution dates.

**Count Two**

AV-4 met Najee Moore in December of 2011. Together with a co-conspirator, Najee Moore recruited AV-4 to prostitute, photographed her, and posted her on Backpage.com for prostitution. Backpage.com is a website that allows users to post classified ads in multiple cities in the United States. It is headquartered in Texas and operates in interstate commerce

**Count Three**

In August 2012, Najee Moore observed JV-3, a sixteen year-old female, exiting a car after arguing with the driver and getting out of the car. Under the ruse of providing JV-3 shelter, Moore took JV-3 to a hotel room for which he paid. With Moore's knowledge, Desirae Casarez dyed JV-3's hair blond, photographed her, and posted her on Backpage.com for prostitution. With Moore's knowledge, Casarez instructed JV-3 as to how to engage with prostitution customers, including instructing JV-3 to ask potential prostitution customers if they were law

enforcement officers and also to touch their genitals. Casarez instructed JV-3 to give the money she received from prostitution customers to Moore. Moore took the money JV-3 earned from engaging in commercial sex acts.

On August 22, 2012, MPD officers conducted an undercover prostitution sting in which they responded to a Backpage.com advertisement offering JV-3 for prostitution. MPD officers met JV-3 at the LaQuinta Hotel in Milwaukee, Wisconsin. The undercover officer went to the designated room, where JV-3 offered him a sex act in exchange for money. JV-3 was taken into custody. In the hotel room, officers recovered K-Y lubricant, condoms and clothing provided by Moore. MPD officers surveilling the hotel premises saw Moore, Casarez and AV-2 leave the hotel parking lot. MPD officers conducted a traffic stop. A search of Moore's car uncovered numerous cell phones, condoms, over $2,000 cash, hotel room keys, a GPS, women's lingerie, and a letter from David Moore to Najee Moore. The letter, dated July 2011, contained the following passages:

> Oh, and before I forget "don't ever ever let you bitch" that's
> Bringing in the most Money stay working at any one place for a
> long time! A long time being over 3 months in a row!! bounce her
> around it will keep your other hoes that work wit her out your
> business, and Niggas; and the People who Run & own the place..
> And it will keep her fresh and off balanced.. Trust me, once other
> hoes at work get in you business, she is almost gone!! She gone
> start listening to their bullshit on why she shouldn't be with U and
> Y she is crazy for fucking with You & giving You her money ..
> and U gonna find yoself arguing with more & more until
> everything falls apart!! And happen with me & Iceass at silks ..
> She was there to many months in a row Tooooo Long!! Same
> thing that happen to P-slim and Asia at silks, there Tooo long and
> she up leaving him for the old-ass White D.V. Trust me, NAJEE,
> a traveling hoe, is a hard working hoe=s a happy hoe. A=working
> hoe=a happy hoe, and happy hoe=a happy Pimp.. So You Need to
> have her on some traveling shit Naj as well as "youself"…
> Traveiling is how I met Dillian, Iycss, Mia Cachero, and a bunch
> of other heavy hitters!! Local hoes only do local shit., go
> Nationwide if u want to catch Big …getting a bitch from
> somewhere else and putting her in the Border and Silks is a "good
> idea." Cause that way she Knows Nobody but U, so there is less
> room for her to run-off and Play games .. But You mus travel,
> cause it allows u to catch other niggas hoe out of Pocket, and off
> gard. And When hoes is out of town they be more like to fuck wit
> u, pay u, and do more out of pocket shit than if they was in Milw at

a home club. And keep you niggas away from your hoes and Pimp
& Hoe business!! . . .
And before I move on, I stress and begg u to go find You a White
Girl Najee – Trust me, you'll see more money than you ever
thought possible!! . . .
Damn Man, we got so much to do, and so much to talk about and
discus. and you can get a lot done through me "and" viceversa!
Cause and honestly, I really want you to get where you can collect
money from certain hoes for me, and just keep it for me and make
sure I get what I need in here.

**Count Four**

Najee Moore and Desirae Casarez met AV-1 during the time alleged in the Information.
AV-1 was attending high school and had recently turned 18. Moore and Casarez approached
AV-1 near a shopping center and spoke with her. Moore initially identified Casarez as his sister,
but AV-1 did not believe him as the two did not act like siblings. Moore told AV-1 that she had
nice legs, and she told him she was trying out for track. Moore exchanged telephone numbers
with AV-1 and the three started hanging out that evening. Casarez told AV-1 that she was not
making a lot of money when she met Moore, but now she earned $300 per hour. Casarez told
AV-1 that she was pretty and that they could earn double or triple what Casarez was making by
working together as strippers or doing Backpage.com prostitution dates. Casarez told AV-1 that
she would have to give her money to Moore at first, but intimated that the relationship would be
a partnership.

On two occasions, Moore drove AV-1 to school, but insisted on picking her up at the end
of the day. While AV-1 was with Moore and Casarez, she witnessed Moore become violent with
Casarez. The first was the night in early October 2011 that AV-1 first prostituted for Najee
Moore. Najee Moore and Casarez briefed AV-1 on conducting prostitution, instructing her to
wear a condom and to get the money up front. AV-1 walked on National Avenue, a high
prostitution area of Milwaukee and conducted her first act of prostitution . AV-1 received $50,
which she gave to Moore; Moore instructed her to go do further prostitution. Later that evening,
Moore and Casarez got into an argument at a gas station and Najee Moore kicked both Casarez
and AV-1 out of the car with all of their belongings. The two women started to walk towards
AV-1's cousin's house, which was a significant distance away. They walked for approximately
one hour when Najee Moore drove by them in his car and stopped. Casarez told Najee to stay

away from them, but Moore approached and slapped Casarez in the face. AV-1 attempted to intervene and tell Najee to stop. Moore grabbed AV-1's shirt, but did not strike her. Moore then ordered Casarez and AV-1 to get into the car.

On one occasion, when AV-1 got out of class and was trying to avoid Najee Moore, she saw Moore and Casarez in Moore's car waiting for her. AV-1 told Najee Moore she did not want to walk on National Avenue for prostitution dates. She began to yell and scream. Moore drove AV-1 to a park and climbed into the backseat and attempted to calm AV-1 down. Moore did not become physical at that time, but resorted to yelling at AV-1 in an effort to convince her to stay with him and continue prostituting. AV-1 continued prostitute for Moore.

In late October 2011, AV-1 and Casarez were arrested by Fond du Lac Police as part of an undercover sting operation. This was the first "date" which AV-1 and Casarez jointly conducted. The undercover officer arranged the date by responding to a Backpage.com posting. Casarez photographed AV-1 for the ad and posted the ad using Moore's mother's computer or someone's cell phone. For the posting, Desirae Casarez or AV-1 gave AV-1 the nickname "Passion," and Casarez used her stripper name, "Desire," to post herself. Moore obtained a prepaid credit card from Walgreen's to pay for the posting. When prospective clients called Najee Moore's cell phone in response to the Backpage.com ad, Casarez answered the phone and arranged the prostitution encounter at a hotel in Fond du Lac, Wisconsin.

Najee Moore transported AV-1 and Casarez to the hotel where the date was to occur, and remained outside the hotel during the date. Moore discussed with Casarez and AV-1 about being polite and to get the money first. The prostitution encounter was, in fact, an undercover police sting, which resulted in AV-1 and Casarez being arrested for prostitution. Najee Moore paid the bail for AV-1 and Casarez and told them that they would have to continue prostituting to make back the money. After the Fond du Lac arrest, AV-1 tried to distance herself from Najee Moore and Casarez and returned to school. Moore approached her at the end of the day as she walked to her bus and asked to know where she had been. Najee Moore told her that he missed her and that he wanted her to continue to be with them. Thereafter, AV-1 moved around Milwaukee and avoided further contact with Moore and Casarez.

**Count Five**

As part of this offense, Defendant Najee Moore committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere,

During the times alleged in the Information, Casarez met AV-2 in Arizona and later sent a photo of AV-2 to Najee Moore via her mobile phone, a facility in interstate commerce. AV-2 was nineteen years old at the time and working at a McDonald's restaurant. Casarez and AV-2 agreed to travel to Chicago, Illinois, and Milwaukee, Wisconsin to engage in prostitution. Later, Casarez introduced AV-2 to Najee Moore in Milwaukee. Moore and Casarez recruited AV-2 to continue to prostitute in Chicago, Illinois and Milwaukee, Wisconsin and to give the proceeds from prostitution to Moore. Moore transported Casarez and AV-2 to Chicago, Illinois, where AV-2 prostituted. Moore and Casarez, on separate occasions, convinced AV-2 to give Najee Moore the money AV-2 earned from engaging in commercial sex acts. AV-2 then told Najee Moore that she wanted to return to Arizona, but Najee Moore insisted that she remain and continue earning money. A few days later, Najee Moore drove AV-2 and Casarez back to Milwaukee and rented a room at the LaQuinta. Najee Moore and Desirae Casarez advertised AV-2 on Backpage.com, a facility in interstate commerce, for prostitution in Milwaukee.

On August 20, 2012, Moore brought JV-3 to the hotel room for purposes of prostituting JV-3. Najee Moore learned that AV-2 was communicating with another pimp. Later that day, Najee Moore drove AV-2, JV-3 and Casarez to the north side of Milwaukee where Najee Moore offered AV-2 to another pimp. AV-2 was crying and begged Najee Moore to let her stay with him.

**Count Six**

As part of this offense, Defendant Najee Moore committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere,

In December 2012, Casarez travelled to Rockford, Illinois to work as an exotic dancer and sent Moore some of the proceeds from her work. In the past, Moore and Casarez agreed that Casarez should alert Moore to females that could prostitute for them in Milwaukee.

While working in Rockford, Illinois, Casarez met, AV-3 who was 18 years old. AV-3 was a prospect to work for Moore and Casarez. On January 2, 2013, Casarez invited AV-3 to go to Milwaukee for a few days to party. AV-3 accepted. Moore drove from Milwaukee to Rockford to pick Casarez up. Casarez introduced Moore to AV-3. Moore drove Casarez and AV-3 to Casarez's apartment in Milwaukee. The next day, Casarez began making sexual overtures to AV-3, which she rejected. At one point, AV-3 recalled Casarez staring at her

genital area and saying, "oh look, it just said hey, I want to see it, just let me see it." Casarez's comments made AV-3 uncomfortable.

Casarez went to the bedroom with Najee Moore and AV-3 could hear them having sex. After approximately two hours, Casarez emerged from the bedroom naked and asked AV-3 to join them. AV-3 refused, but Casarez persisted in her requests. A short time later, Casarez came back out of the bedroom and asked why AV-3 looked so mad. AV-3 said she just wanted to go home and asked that Casarez or Moore take her home or to the bus station. Casarez told her that was ok and that a bus ticket would cost $30. Casarez left to speak with Moore and returned a little later and started to pack up AV-3's belongings. AV-3 asked Casarez what was going on and if Moore was going to take her. Casarez told her she was not sure but to start getting ready just in case. AV-3 went downstairs to get her clothing out of the dryer and when she came back she saw Casarez going through her purse. AV-3 went through her wallet and saw only $30 of the $141 she had originally. AV-3 was upset and confronted Casarez about the money. Najee Moore entered the living room and Casarez went to the bedroom.

Najee Moore tried to calm AV-3 and talked to her for a while, trying to convince her to stay in Milwaukee. Najee Moore told AV-3 that she could make money dancing and that she should go to the strip clubs with Desirae Casarez. AV-3 refused and insisted she just wanted to go home. Najee Moore responded, "What if I want you to stay?" AV-3 then contacted a friend and asked him to get a number for a cab company in Milwaukee because her Internet was not working on her phone. AV-3 then got the address of the house from some mail on the dresser and called a cab. AV-3 asked Najee Moore whether the address was North or South 24th Street. AV-3 told Najee Moore she wanted to take a cab, but Moore indicated he would take her to the bus station. Najee Moore told AV-3 that she had to give him $80.00 for him to take her to the bus station. AV-3 began to text someone on her phone, but Moore tried to take away the phone. AV-3 began to scream loudly and Moore covered her mouth with his hand. AV-3 tried to kick Moore and he told her to calm down. AV-3 was scared and stopped resisting. Casarez stayed in the bedroom during the struggle. AV-3 and Najee Moore argued about how much money AV-3 would need to get home and Moore again told her to give him $80 and he would take her to the bus station. AV-3 then gave Moore $80.00. Casarez then came out of the bedroom, and Moore, Casarez, and AV-3 walked to the car together with AV-3's travelling bags.

Rather than drive to the bus station, Moore stopped under an overpass and for approximately 15 minutes, tried to convince AV-3 to stay in Milwaukee. AV-3 indicated she just wanted to go home; but Moore instead asked for AV-3's phone so he could examine it. Najee Moore saw messages she was sending her friends. Moore then again attempted to convince AV-3 to stay in Milwaukee. Casarez then spoke to AV-3, who then agreed to stay. Moore drove everyone back to Casarez's home.

When they got back to the house, Casarez began to give AV-3 oral sex in the living room. At this time, Moore was in the bedroom. As Casarez performed oral sex on AV-3, Najee Moore came from the bedroom, walked up to AV-3, and put his penis in her mouth. He did this for one or two minutes and then engaged in sexual intercourse with Casarez as she continued performing oral sex on AV-3. Casarez then straddled AV-3 's face. AV-3 told her she didn't perform oral sex on women. Moore then said to her that she should try it if she hasn't done it before. Casarez then sat on AV-3's face while Najee Moore had sexual intercourse with AV-3. Moore then directed AV-3 and Casarez to change positions as the sex act continued. Desirae Casarez told Moore to "keep fucking that bitch." After a few minutes, Moore stopped and left the room with Casarez. Najee Moore believed that the sexual contact he was having with AV-3, and the sexual contact Casarez was having with AV-3, was consensual.

The next day AV-3 sent a text message to her stepfather to say that she had been kidnapped and needed help. AV-3's stepfather contacted the Milwaukee Police Department (MPD). A recording of the telephone conversation between AV-3's stepfather and the MPD dispatcher indicates that AV-3's stepfather was in simultaneous communication with AV-3 via text messages as Moore, Casarez, and AV-3 were travelling around Milwaukee. As they drove, AV-3 continued texting location updates to her stepfather, who relayed these to the MPD dispatcher. When Najee Moore stopped the car at a house, AV-3 jumped out and ran to a nearby police car. Moore and Casarez sped away. AV-3 later stated to MPD that she was held against her will and sexually assaulted. The defendant asserts that he did not sexually assault AV-3.