

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                            Case No. 13-CR-84

DAVID MOORE
    a/k/a "King David," "KD," "Daddy,"

    Defendant.

---

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Gregory J. Haanstad, Acting United States Attorney for the Eastern District of Wisconsin, Karine Moreno-Taxman, Assistant United States Attorney, and Daniel H. Weiss, Trial Attorney, United States Department of Justice Civil Rights Division, and the defendant, David Moore, individually and by attorney Krista Halla-Valdes, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged by information, which alleges violations of Title 18, United States Code, Sections 1590 and 371.

3.     The defendant has read and fully understands the charges contained in the information. He fully understands the nature and elements of the crimes with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.    The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.    The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

I. OBJECT OF THE CONSPIRACY

From on or about 2004 and continuing through on or about 2013 in the State and Eastern District of Wisconsin and elsewhere, the defendant,

DAVID MOORE,
a/k/a "King David," "KD," "Daddy,"

and others known and unknown to the United States Attorney, conspired and agreed with each other to:

a.    provide and obtain the labor or services of a person by means of force, threats of force, physical restraint and threats of physical restraint, and by means of serious harm and threats of serious harm and by means of a scheme, plan or pattern intended to cause a person to believe that if he/she did not provide the labor services, that he/she or another person would suffer serious harm or physical restraint, and

b.    knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain and maintain by any means a person, and benefit, financially and by receiving anything of value, from participation in a venture which recruited, enticed, harbored, transported, provided, obtained and maintained persons, knowing and in reckless disregard of the fact that force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591 (e)(2), and any combination of such means would be used to cause the person to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591(a)(1), (2).

II. MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

2

1.      Defendant MOORE and co-conspirator Paul Carter were engaged in recruiting, enticing, harboring, transporting, providing and maintaining persons, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud or coercion would be used to cause such persons to engage in commercial sex acts.

2.      Defendant Moore and co-conspirator Paul Carter collaborated with one another for the purpose of identifying, recruiting and obtaining persons who they could each compel to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591 and who they could each compel to engage in erotic dancing.

3.      Co-conspirator Carter would direct victims under his control to arrange for victims under defendant David Moore's control to be permitted to dance at particular erotic dance clubs, where they could earn money and also procure commercial sex act customers.

4.      Defendant Moore and co-conspirator Paul Carter would transport victims to erotic dance clubs for them to engage in dancing and procure commercial sex act customers.

5.      Defendant Moore and co-conspirator Paul Carter received the earnings from their victims made engaging in erotic dancing and/or commercial sex acts.

6.      Defendant Moore frequented bars, erotic dance clubs and streets well-known for prostitution activity with co-conspirator Paul Carter to identify and recruit victims.

7.      In order to maintain and continue to coerce and force victims to engage in labor and services as erotic dancers and to engage in commercial sex acts, Defendant Moore  and co-conspirator Paul Carter would physically, psychologically and financially harm victims and would inflict and threaten serious harm, including physical harm, to victims.

III.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the dates indicated below, defendant Moore and co-conspirator Paul Carter, and unindicted co-conspirators known and unknown to the United States Attorney, committed the following overt acts, among others, within the Eastern District of Wisconsin and elsewhere:

1.      Beginning in or around January 2006 and continuing through in or around December 2012, defendant Moore drove with co-conspirator Paul Carter around the City of Milwaukee, to identify and recruit victims for labor and/or sex trafficking

2.   In or around December 2009, defendant Moore drove co-conspirator Paul Carter's van to pick up victims AV-4 and AW-1, after a week of working as erotic dancers in northern Wisconsin, to take control of their earnings and return them to Milwaukee. While en route to Milwaukee co-conspirator Paul Carter assaulted AW-1 by beating about the head and face for conduct Carter perceived as disrespectful. When the group arrived in Milwaukee, Carter continued beating AW-1 in the street as defendant Moore stood by with AV-4 and observed.

3.   In or about August 2008 and continuing through on or about August 2011, defendant Moore with co-conspirator Paul Carter, transported AV-3 and other victims for them to engage in erotic dancing and commercial sex acts for Paul Carter's financial gain.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

The United States Attorney re-alleges paragraphs I-III above as though fully set forth here and further alleges that, from on or about February 2008 and continuing through on or about August 2009 in the State and Eastern District of Wisconsin and elsewhere, the defendant,

DAVID MOORE,
a/k/a "King David," "KD," "Daddy,"

did knowingly recruit, harbor, transport, provide and obtain by any means, a person, JV-1, for labor or services, in violation of Title 18, United States Code, Chapter 77.

As part of this offense, Defendant DAVID MOORE, committed the following acts in the State and Eastern District of Wisconsin and elsewhere:

a) From on or about February 2008 and continuing through on or about August 2009, DAVID MOORE knowingly recruited, harbored, transported, provided, and obtained JV-1, a person, for labor and services as an erotic dancer; and

b) DAVID MOORE acted knowing that force and threats of force were being used to obtain the labor and services of JV-1 as an erotic dancer.

All in violation of Title 18, United States Code, Section 1590.

4

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, the charged offense or other offenses.

## PENALTIES

7.     The parties understand and agree that the offense to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: Count One, 5 years imprisonment; 3 years of supervised release and a fine of $250,000; Count Two, 20 years imprisonment; 5 years of supervised release and a fine of $250,000. The offenses also carry a mandatory special assessment of $100 per count. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 31 of this agreement.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF INDICTMENT

9.     The government agrees to move to dismiss the indictment and superseding indictments at the time of sentencing.

## ELEMENTS

10.     The parties understand and agree that in order to sustain the charge of Trafficking as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

5

First, that the defendant recruited, transported, provided, or obtained by any means, a person for labor or services in violation of Title 18, United States Code, Chapter 77; and Second, that the defendant acted knowingly.

11. The parties understand and agree that in order to sustain the charge of Conspiracy to engage and sex trafficking or forced labor, as set forth in Count Two, the government must prove each of the following beyond a reasonable doubt:

First, beginning on or about a date unknown and continuing through on or about December 2012, an agreement existed between two or more persons to commit the crime of labor trafficking, in violation of Title 18, United States Code, Section 1589, sex trafficking, in violation of Title 18, United States Code, Section 1591 or both, and
Second, the defendant became a member of the conspiracy, knowing of at least one of its objects and intending to help accomplish it, and
Third, one of the members of the conspiracy performed at least one overt act on or after August 4, 2009 for the purpose of carrying out the conspiracy.

The defendant understands that to be guilty of sex trafficking in violation of Title 18, United States Code, Section 1591, the following must be true: (1) the defendant knowingly recruited, enticed, harbored, provided maintained or obtained by any means, a person; (2) defendant knew or was in reckless disregard of the fact that means of force, fraud or coercion or any combination of such means would be used to cause the person to engage in a commercial sex act or defendant knew or was in reckless disregard of the fact that the person had not attained the age of 18 years old and would be caused to engage in a commercial sex act; and (3) such recruitment, enticement, harboring, providing, maintaining or obtaining was in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States. The term "coercion" means threats of serious harm to or physical restraint against any person ; any scheme plan or pattern intended to cause such person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or legal process. The term "commercial sex act" means any sex act, on account of which anything of value is given or received by a person.

The defendant understands that to be guilty of labor trafficking, in violation of Title 18, United States Code, Section 1589, the following must be true: (1) the defendant knowingly provided or obtained the labor or services of a person by any one of, or by any combination of, the following means – (a) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (b) by means of serious harm or threats of serious harm to that person or another person; (c) by means of the abuse or threatened abuse of law or legal process; or (d) by means of any scheme, plan or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

6

## SENTENCING PROVISIONS

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

16.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any

7

right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty. The defendant acknowledges that the counts contained in the second and third superseding indictments and any counts dismissed from the information will also be considered by the court as part of his relevant conduct.

## Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 34 under Sentencing Guidelines Manual §§ 2X1.1 and 2G1.1

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two is 22 under Sentencing Guidelines Manual § 2H4.1.

## Specific Offense Characteristics

20.     The defendant acknowledges that the government will recommend to the sentencing court that the following increases are applicable to the defendant:

a. an increase of the base offense level for Count Two to 36 because another felony offense, namely Title 18, U.S. Code, Section 1591, was committed during the

8

commission or, or in connection with, the involuntary servitude offense under Sentencing Guidelines Manual §§ 2H4.1(b)(4)(B) and 2G1.3(a)(1) and (b);

b. 2-level increase as the minor was in the custody, care, or supervisory control of the defendant under Sentencing Guidelines Manual § 2G1.3(b)(1)(B);

c. 2-level increase as a participant unduly influenced a minor to engage in prohibited sexual conduct under Sentencing Guidelines Manual § 2G1.3(b)(2)(B);

d. 2- level in increase as the offense involved the commission of a sex act or sexual contact under Sentencing Guidelines Manual § 2G1.3(b)(2)(B); and

e. 2-level increase as the defendant was an organizer, leader, manager, or supervisor under Sentencing Guidelines Manual § 3B1.1(c).

The parties understand that the defendant will not join in these recommendations.

## Acceptance of Responsibility

21.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offense[s] prior to sentencing.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

9

## Sentencing Recommendations

22.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

23.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

24.     The government agrees to recommend a sentence of 300 months, unless the government moves for a downward departure as delineated in paragraph 32. The defendant agrees to recommend a sentence of no less than 180 months.

## Court's Determinations at Sentencing

25.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

10

## FINANCIAL MATTERS

27.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

28.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Special Assessment

29.     The defendant agrees to pay the special assessment prior to or at the time of sentencing.

## SEX OFFENDER REGISTRATION

30.     Pursuant to 18 U.S.C. § 3583(d), the defendant has been advised and understands the court shall order as a mandatory condition of supervised release, that the defendant comply with state sex offender registration requirements. The defendant has also been advised and understands that under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdiction: The location of his residence; the location of his employment; and, if he is a student, the location of his

11

school. Registration will require that the defendant provide information that includes name, residence address, the names and addresses of any places at which he will be an employee or a student. The defendant understands that he must update his registration not later than three business days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations may subject him to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine and/or imprisonment.

## Restitution

31.     The defendant agrees to pay restitution as ordered by the court to JV-1, JV-2, AV-1, AV-4 and AV-7. The government estimates the total restitution amount to be approximately $200,000. The parties acknowledge and agree that the amount of restitution may be higher or lower based upon additional information which may come to the parties' attention prior to sentencing. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

32.     The government acknowledges, understands and agrees that the defendant has provided some substantial assistance to the government in the investigation and prosecution of others. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant continues to provide substantial assistance to the government in this investigation or

12

prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range and dismissal of Count Two of the Information. The government would then recommend a sentence of 20 years, the statutory maximum faced on conviction of Count One of the Information. The defendant is free to recommend a sentence of not less than 15 years. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

33.    Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case, and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, (3) ineffective assistance of counsel and (4) a sentence predicated on a failure of the court to consider the defendant's principal, non-frivolous arguments in mitigation when selecting an appropriate sentence for the defendant. The defendant agrees that such appeal is limited to the sentence(s) and that the defendant cannot appeal the conviction(s).

34.    In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.  If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

35.  The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

36.  The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights,

14

including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

37.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

38.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

39.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

40.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

41.     If the defendant enters this plea agreement, is sentenced, and the convictions are not reversed on any grounds, the United States Attorney for the Eastern District of Wisconsin agrees not to prosecute J.M. and/or L.M., the defendant's sons, in the Eastern District of

15

Wisconsin for their role in the defendant's sex and/or labor trafficking activities known to the United States Attorney's Office through November 2013.

42. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

43. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

44. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the

16

defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

45.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

17

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 10-27-15 _____

David Moore
Defendant


I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 10/27/15 _____

KRISTA HALLA-VALDES
Attorney for Defendant


For the United States of America:

Date: 10/27/15 _____

GREGORY J. HAANSTAD
Acting United States Attorney


Date: 10/27/15 _____

for KARINE MORENO-TAXMAN
Assistant United States Attorney


Date: 10/27/15 _____

DANIEL H. WEISS
Trial Attorney

18

# ATTACHMENT A
# FACTUAL BASIS

**Count One**

As part of this offense, Defendant David Moore committed the following acts, among others, in the Eastern District of Wisconsin and elsewhere:

In 2004, David Moore met Paul Carter as a result of Paul Carter's attempt to persuade AW-2, who was then working for Moore as an erotic dancer and prostitute, to work in the same capacity for Carter instead. Moore confronted Carter and threatened to fight him, but Carter backed down. Following Moore's release from imprisonment in 2006, and lasting until approximately 2012, Moore and Carter established and maintained a friendly association based upon the fact that both men were engaged in compelling women to work as erotic dancers and prostitutes through means of force, fraud and coercion Moore and Carter's association included the following activities, among others, which were intended to promote and support their sex and labor trafficking activities:

Moore and Carter drove the streets of Milwaukee in Carter's vehicles mostly but at times in Moore's, cruising the streets on an almost daily basis for the purpose of identifying, enticing, recruiting, and obtaining young women who they believed could be compelled to work for them as erotic dancers and prostitutes through the use of force, fraud or coercion. Moore and Carter frequently traveled together to bars and erotic dance clubs for the same purpose. Moore and Carter would critique one another's approach to potential victims and competed with one another to obtain victims. On one occasion, Moore and Carter traveled to an erotic dance club in Iowa for the same purposes. Moore encouraged Carter to recruit white victims to dance and prostitute for him, based on Moore's perception that these victims would make more money for the person who controlled them. Moore frequently visited the Milwaukee "tracks," (areas well-known for prostitution activity) with Carter to observe and monitor the individuals working for Carter and to troll for victims.

On a routine basis, Carter would have Moore to accompany him to the Greyhound Bus station in Milwaukee pick up young women under Carter's control who were returning from out-of-town engagements where they engaged in erotic dancing and prostitution. Upon arrival, Moore would witness the women immediately given their earnings (thousands of dollars in cash) to Carter, stating, "Here, Daddy." Moore also accompanied Carter on trips to drop off AV-3, AW-1 and AV-4 for engagements at erotic dance clubs in Northern Wisconsin where they were required to earn money as dancer and to also procure prostitution customers.

Moore was aware that Carter was a "gorilla pimp," and frequently used violence, force and other means of coercion to compel his victims to continue working for him as erotic dancers and prostitutes. Moore witnessed Carter's violence and coercive tactics on numerous occasions. On one occasion, Moore accompanied Carter on a trip to Northern Wisconsin to drop off AV-4, one of the women who was working for Moore and AW-1, who was working for Carter. At the direction of Moore and Carter, AW-1 spoke with the erotic dance club manager so that AV-4 would be permitted to work there. Moore and Carter returned one week later to pick the women

up. On the drive back to Milwaukee, Moore observed Carter punch AW-1 in the face numerous times for perceived disrespect. When the group arrived in Milwaukee, Moore observed Carter continue his beating of AW-1 on the street, where Carter used the drawer of an abandoned dresser to severely beat AW-1; Moore did nothing to intervene in the beating. On another occasion, Moore was with Carter at a Milwaukee bar and observed Carter require one of the women under his control, AV-3, to get down on her hands and knees and bark like a dog as a punishment for having accepted a drink from another man. Carter also confided to Moore, on a separate occasion, that he had beaten AV-3, and described to Moore how Carter had broken AV-3's front teeth, because AV-3 was not getting along with other women working for Carter at the time. Moore observed Carter inflict frequent and arbitrary violence against the women working for him and counseled him to use less violence and, instead, employ other strategies to persuade and coerce victims to remain with Carter.

Moore participated with Carter and other pimps in activities known as "Pimp Roundtables." The purpose of these functions was for Moore, Carter and others engaged in sex and labor trafficking to convene and discuss methods to pressure pimps who were not following accepted norms (e.g., fighting among pimps, excessive violence against trafficking victims) to persuade them to correct their behavior. Carter participated in these roundtables with Moore, although Carter's own violent conduct was frequently the topic of these roundtable discussions.

## Count Two

As part of this offense, Defendant David Moore committed the following acts, among others in the Eastern District of Wisconsin and elsewhere:

David Moore's son, Najee Moore, introduced him to JV-1 beginning on or about July 2007, when JV-1 was 15 years old and Najee Moore was 16 years old. Najee Moore and JV-1 began dating and spending time together. After Najee Moore and JV-1 were required to leave the location where they were living on or about January 2008, Najee Moore and JV-1 lived intermittently with Defendant David Moore from on or about February 2008 through on or about August 2009. During this time, David Moore instructed Najee Moore as to how to compel JV-1 to provide her labor and services as an erotic dancer. David Moore was aware that JV-1 had false identification which showed her to be over 18 in order to work as an erotic dancer. David Moore and Najee Moore transported JV-1 to erotic dance clubs, including "Ricky's" and "On the Border," where David Moore convinced the managers to allow JV-1 to work as a dancer. David Moore also instructed JV-1 as to dance, how to approach and procure potential prostitution customers and what to charge for prostitution encounters.

JV-1 danced at "On the Border" for a little over a week, earning an average of $75 to $150 per night. JV-1 gave most of the money to Najee Moore. David Moore counseled Najee Moore that JV-1 would make more money by engaging in prostitution in addition to dancing. Najee Moore used force to control and intimidate JV-1, including punching her in the stomach with a closed fist, slapping her in the face with an open hand and choking her by wrapping his arm around her neck from behind. David Moore counseled Najee that she should limit his arbitrary use of violence on JV-1, out of concern that Najee's conduct would cause JV-1 to eventually run away and to only use violence when there was "a reason." During this time, David Moore had other individuals engaging in commercial sex acts and providing the earnings

Case 2:13-cr-00084-RTR   Filed 10/27/15   Page 20 of 21   Document 110

to him. JV-1 observed David Moore's physical and verbal abuse of these individuals to ensure their compliance with his orders.

In addition to "On the Border," David Moore transported JV-1 to another Milwaukee erotic dance club called "Solid Gold." David Moore stayed in the club to monitor JV-1 while she worked, but acted as though he did not know her. JV-1 did not make much money at "Solid Gold" and did not procure any prostitution customers. After work, David Moore counseled JV-1 on the men he believed she should have been approaching. While dancing at "Solid Gold," JV-1 met a prostitution customer to whom she provided commercial sex acts. David Moore, in collaboration with Najee Moore, planned for JV-1 to work in various Milwaukee dance clubs, transported JV-1 to the dance clubs for her to provide her labor and services and also procure prostitution customers, instructed JV-1 as to the fees to charge for the commercial sex acts.